**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-2790-21
      A-1339-22

CONGREGATION SONS OF
ISRAEL,

  Plaintiff-Respondent,

v.

CONGREGATION
MEOROSNOSSON, INC.,

  Defendant-Appellant.

_____

CONGREGATION SONS OF
ISRAEL,

  Plaintiff-Respondent,

v.

TOWNSHIP OF LAKEWOOD
ZONING BOARD OF
ADJUSTMENT,

  Defendant,

and

TOWNSHIP OF LAKEWOOD,

    Defendant-Respondent,

and

CONGREGATION
MEOROSNOSSON, INC.,

    Defendant-Appellant.

_____

    Argued November 6, 2024 – Decided January 20, 2026

    Before Judges Gooden Brown and Smith.

    On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Docket Nos. C-000239-12 and L-2664-18.

    Ronald S. Gasiorowski argued the cause for appellant Congregation Meorosnosson, Inc. (Gasiorowski & Holobinko, attorneys; Ronald S. Gasiorowski, on the briefs).

    Andrew J. Kelly argued the cause for respondent Congregation Sons of Israel (The Kelly Firm, PC, attorneys; Andrew J. Kelly, of counsel and on the briefs; Chryssa Yaccarino and Nicholas D. Norcia, on the briefs).

    Harold N. Hensel argued the cause for respondent Township of Lakewood (Secare & Hensel, attorneys; Harold N. Hensel, on the brief).

    The opinion of the court was delivered by

GOODEN BROWN, P.J.A.D.

2

This case returns to us after we reversed and remanded a Chancery Division order granting plaintiff Congregation Sons of Israel partial summary judgment establishing that through a 1963 agreement, plaintiff had been granted an express easement to park on defendant Congregation Meorosnosson, Inc.'s property. Specifically, the property was designated the Fifth Street and the Sixth Street lots.

Plaintiff and defendant are adjacent landowners in Lakewood with an extensive and contentious litigation history. Plaintiff operates an Orthodox Jewish synagogue, and defendant operates a parochial school. During the remand proceedings, the Chancery Division judge conducted a bench trial and determined, among other things, that plaintiff had an easement to park on defendant's property that was to continue so long as plaintiff operated an Orthodox Jewish synagogue. The judge also determined that the easement provided plaintiff access to service its HVAC system on defendant's property.[1]

While the easement litigation was ongoing, defendant applied to the Lakewood Township Zoning Board of Adjustment (ZBA) seeking either an interpretation under N.J.S.A. 40:55D-70 that plaintiff's parking on defendant's

_____

[1] After granting partial summary judgment, the judge conducted a bench trial in 2017 to address issues not resolved by the summary judgment motion.

property required a variance and site plan approval, or a certificate pursuant to N.J.S.A. 40:55D-68 that plaintiff's use of defendant's property for parking was an illegal, nonconforming use. The ZBA concluded plaintiff's use of defendant's property for parking was an illegal, nonconforming use, and passed a resolution memorializing its findings. Plaintiff challenged the resolution in a prerogative writs action against the ZBA, the Township of Lakewood (Township), and defendant. Following a final hearing, a Law Division judge invalidated the resolution and these back-to-back appeals followed.

In A-2790-21, the easement litigation, defendant appeals from the judgment confirming plaintiff's express easement as well as orders: (1) denying defendant's motion to recuse the judge from presiding over the remand trial; (2) granting plaintiff's motion to exclude certain evidence arising out of the proceedings before the ZBA; (3) denying defendant's motion to compel the return of monies paid pursuant to prior trial court orders; and (4) granting plaintiff sanctions and attorney's fees.

Defendant raises the following points for our consideration in A-2790-21:

> POINT ONE
>
> THE TRIAL JUDGE ERRONEOUSLY FAILED TO RECUSE HIMSELF ON THE REMAND TRIAL AFTER MAKING CREDIBILITY DETERMINATIONS ON THE CASE AND

WITNESSES. THE PREDISPOSITIONS WERE EVIDENCED IN THE REMAND DETERMINATION/OPINION, AND SHOULD INVALIDATE THAT OPINION/ORDER.

POINT TWO

THE PLAINTIFF'S EVIDENCE AT TRIAL FAILED TO MEET ITS BURDEN TO PROVE THAT THE 1963 AGREEMENT ESTABLISHED A PERMANENT EASEMENT ON THE SCHOOL LOT . . . FOR AN OFF-SITE PARKING USE BY STAFF/ATTENDEES OF THE SYNAGOGUE . . . OR FOR ACCESS TO THE SIXTH STREET BOILER ROOM.

POINT THREE

THE TRIAL COURT ERRED IN EXCLUDING FROM EVIDENCE THE LAKEWOOD ZONING BOARD RESOLUTION THAT THE . . . OFF-SITE PARKING ON THE SCHOOL . . . IS NOT A LEGAL NONCONFORMING USE. THERE IS NO MUNICIPAL LAND USE BOARD APPROVAL FOR ANY SUCH JOINT PARKING USE ON THE SCHOOL . . . . THE 1972 SITE PLAN APPROVAL FOR THE EXPANSION OF SCHOOL PROPERTY DOES NOT INCLUDE JOINT PARKING USE, INFERENTIALLY PRECLUDES SUCH USE, AND IS CONCLUSIVE THAT NO EASEMENT EXISTED OR THAT THE LICENSE TERMINATED.

POINT FOUR

REVIEW OF THE TRIAL EVIDENCE CONFIRMS THE PROOFS PRESENTED FAIL TO DEMONSTRATE A PERMANENT EASEMENT WAS INTENDED AND CREATED, AND

5

DEMONSTRATE ONLY A LICENSE WAS INTENDED AND CREATED THAT HAS TERMINATED.

POINT FIVE

EVEN IF THE 1963 AGREEMENT COULD BE DEEMED AS CONVEYING A PERPETUAL EASEMENT, THAT USE CANNOT BE EXPANDED AND EXCEEDED BEYOND THE BOUNDS AND LIMITATIONS OF THAT EASEMENT USE IN APPROXIMATELY 1964. THE TRIAL COURT OPINION AND ORDER EXPANDING THAT USE IS IN ERROR.

POINT SIX

THE TRIAL COURT FAILED TO FOLLOW THE APPELLATE COURT'S REMAND, AND ERRONEOUSLY TRIED AND DECIDED THE ISSUES AS A CONTINUATION OF THE 2017 TRIAL AND DECISION.

POINT SEVEN

THE TRIAL COURT ERRED IN DENYING MEOROSNOSSON'S MOTION TO COMPEL THE RETURN OF MONIES PAID PURSUANT TO THE JUNE 27, 2017 JUDGMENT AND MARCH 6, 2018 ORDER WHICH WERE VACATED BY THE APPELLATE DIVISION ON JUNE 25, 2019.

POINT EIGHT

THE TWO FEBRUARY 21, 2019 ORDERS AND THE TWO MAY 29, 2019 ORDERS AWARDING SANCTIONS/ATTORNEY'S FEES RELATING TO THE SIXTH STREET VIOLATIONS AND THE

6

FENCE VIOLATION ARE NOT ONLY PRODUCTS OF THE ERRONEOUS JUNE 27, 20[1]7 ORDER OF THE TRIAL COURT-WHICH RESULTED IN AN UNCONTROLLED AND DANGEROUS SITUATION IN FRONT OF A 400-STUDENT GRADE SCHOOL AND WAS SUBSEQUENTLY VACATED BY THE APPELLATE DIVISION ON JUNE 25, 2019-BUT ALSO AN ABUSE OF THE TRIAL COURT'S DISCRETION.

In A-1339-22, the prerogative writs action, defendant appeals from the final judgment invalidating the resolution as well as the order denying its motion in limine to find plaintiff had submitted documents to the court that were not before the ZBA. Defendant raises the following points for our consideration in A-1339-22:

POINT I

THE SCHOOL'S APPLICATION/APPEAL TO DETERMINE THE VALIDITY OF THE SYNAGOGUE'S OFF-SITE PARKING USE OF THE SCHOOL . . . AS A NONCONFORMING USE WAS PROPERLY BEFORE THE ZONING BOARD AS PER N.J.S.A. 40:55[D]-68.

POINT II

AN OFF-SITE PARKING USE/FACILITY ON THE SCHOOL . . . FOR . . . SYNAGOGUE STAFF/ATTENDEES IS NOT A PERMITTED USE FOR EITHER LOT . . . UNDER CURRENT ZONING REGULATIONS.

POINT III

7

THE BURDEN OF PROOF AS TO THE LEGALITY OF THE NONCONFORMING OFF-SITE PARKING USE OF THE SCHOOL . . . BY THE SYNAGOGUE ATTENDEES/STAFF WAS ON [PLAINTIFF] AS PROPONENTS OF THE USE.

POINT IV

THE PLAINTIFF SYNAGOGUE AND THE ZONING BOARD ATTORNEY (NOT THE ZONING BOARD ITSELF) ERRONEOUSLY ASSERTED BELOW THAT THE CHANCERY COURT DETERMINATION—THAT A PARKING EASEMENT . . . WAS ESTABLISHED BY THE 1963 AGREEMENT—WAS DETERMINATIVE AS TO THE N.J.S.A. 40:55D-68 DETERMINATION OF THE ZONING BOARD. THE TRIAL COURT ERRONEOUSLY ADOPTED THAT ANALYSIS/POSITION.

POINT V

THE SUBMISSION BY PLAINTIFF OF NEW DOCUMENTS NOT BEFORE THE ZONING BOARD WAS NOT PROPER. THE TRIAL COURT'S RELIANCE ON SUCH DOCUMENTS FOR ITS INCORRECT DECISION REQUIRES REVERSAL.

POINT VI

THE PLAINTIFF AND THE ZONING BOARD ATTORNEY, ASSERTION THAT THE CHANCERY COURT DETERMINATION THAT AN EASEMENT FOR PARKING EXISTS IS DETERMINATIVE ON THE OFF-SITE PARKING USE BEING A LEGAL NONCONFORMING USE AND THE BOARD

8

SHOULD HAVE DEFERRED ITS DECISION—WAS
WITHOUT MERIT.

POINT VII

PLAINTIFF'S IMPROPER SUBMISSION AND THE
TRIAL COURT'S ACCEPTANCE OF DOCUMENTS
NOT BEFORE THE BOARD [MISLED] THE TRIAL
COURT TO MAKE INACCURATE FINDINGS.

We consolidate the appeals for purposes of issuing a single opinion, reject each of defendant's arguments, and affirm.

I.

Background

Plaintiff's and defendant's properties comprise a rectangle bordered by Sixth Street to the north, Madison Avenue to the east, Fifth Street to the south, and Forest Avenue to the west. Prior to 1962, the Jewish Center and Hebrew Day School of Lakewood (Hebrew Day), defendant's predecessor in title, owned the entire property at issue. In late 1962, Hebrew Day executed a deed conveying the northeast corner of its property to plaintiff.

On January 7, 1963, Hebrew Day and plaintiff entered into an agreement (the 1963 agreement) regarding the use of the land. The 1963 agreement specified that plaintiff was to "erect a sanctuary, lounge, daily chapel, social hall with stage, Rabbi's study, offices, library, board room, bride's preparation and

powder rooms, kitchens and related rooms and facilities on the said lands and premises."

Pertinent to these appeals, paragraph ten of the 1963 agreement states:

> [Hebrew Day] agrees to permit [plaintiff] to utilize for parking purposes the vacant lands it owns on Madison Avenue and also on Sixth Street and to permit use of lands on Sixth Street for boiler room use and for a water cooling tower.

The 1963 agreement also provides that plaintiff's newly erected synagogue "shall perpetually be maintained in accordance with Orthodox Jewish tenets and not otherwise." In accordance with the 1963 agreement, plaintiff constructed a synagogue on the corner of Sixth Street and Madison Avenue, which opened on December 15, 1963.

Over the ensuing years, Hebrew Day and plaintiff had a supportive relationship. In recognition of their cooperative relationship, in 1972, Hebrew Day and plaintiff executed a document stating:

> In appreciation of the many considerations extended by [plaintiff] to [Hebrew Day] through all the years, primarily the use of its facilities without charge; the Officers of [Hebrew Day] are pleased to advise that [plaintiff] or any of its affiliates may use the facilities of the Day School, present and future, on the same cooperative basis, without charge.

A-2790-21

Around the same time, Hebrew Day obtained variance and site plan approvals from the Lakewood Township Board of Adjustment (Board) to construct an addition to its school that encroached on plaintiff's property. In granting the 1972 variance, the Board noted: "[T]he applicant is unable to secure any additional lands surrounding its present location and although evidence presented indicates parking provisions to be less than those required pursuant to the existing ordinance, the applicant will have the benefit of parking facilities on adjoining properties owned by [plaintiff] should additional parking facilities be required." Plaintiff did not object to the encroachment.

Although the 1963 agreement was executed by Hebrew Day's and plaintiff's presidents and witnessed by each organization's secretary on January 7, 1963, it was not recorded until June 15, 2007, when the Ocean County clerk's office recorded the 1963 agreement as an "easement." Shmuel Tendler, plaintiff's Rabbi at the time, contacted an attorney about recording the 1963 agreement based on his concerns about the properties.

The following year, Hebrew Day filed for bankruptcy and on August 11, 2010, the bankruptcy court authorized the sale of Hebrew Day's property to defendant. After the purchase, defendant continued to operate Hebrew Day's parochial school on the property. Although the sale order provided defendant

11

would take the property "subject to all liens, claims, interests, encroachments, and encumbrances," once defendant acquired Hebrew Day's property, the parties have engaged in ongoing litigation predominantly over plaintiff's rights to use defendant's property for parking purposes.

There are two areas where plaintiff's congregants and staff park—one area south of plaintiff's property on the southeast corner of Fifth Street and Madison Avenue (the Fifth Street lot), and another area on Sixth Street located between plaintiff and defendant's respective properties (the Sixth Street lot). Although both parking areas are located on defendant's property, defendant mainly challenges plaintiff's congregants parking in the Sixth Street lot.

On November 13, 2012, plaintiff filed a single-count complaint against defendant and sought an order to show cause (OTSC) for injunctive relief to enforce its rights to park on defendant's property, connect its HVAC system to the boiler room located on defendant's property, and prevent defendant from interfering with those rights. Plaintiff later filed an amended complaint with additional counts to, among other things, determine whether it had been given an express easement or an irrevocable license to use defendant's property to park and connect its HVAC system. Defendant filed a contesting answer and counterclaims.

12

Subsequently, plaintiff and defendant each moved for partial summary judgment. On July 15, 2016, the judge entered an order granting partial summary judgment to plaintiff and denying defendant's cross-motion for partial summary judgment. The judge found the 1963 agreement granted plaintiff an easement on defendant's property to park and connect its HVAC system and defendant was restrained from interfering with those easement rights. The judge entered amended orders on July 25, 2016, and August 16, 2016, and denied defendant's subsequent motion for reconsideration.

The issues not disposed of by the summary judgment motions were resolved by bench trial in 2017. Those issues included whether defendant interfered with plaintiff's easement rights, damages for any interference, and any abandonment or extinguishment of the easement rights by the parties. Following the trial, the judge rendered an oral decision on June 5, 2017, finding in favor of plaintiff. A memorializing order was entered on June 27, 2017, granting judgment to plaintiff for $4,529.60, and finding, among other things, plaintiff's congregants and staff had "priority" parking rights to use the Fifth and Sixth Street "during morning and evening services[,] and other events and celebrations held at the synagogue." Further, the order prohibited defendant from allowing schoolchildren from "walk[ing] between parked cars on the street or in the Sixth

Street . . . [l]ot during religious services when [p]laintiff is utilizing the Sixth Street lot for parking."

Defendant appealed the trial judgment, the grant of partial summary judgment, and other orders under docket number A-5303-16. On December 21, 2017, while the appeal was pending, plaintiff moved to enforce litigant's rights by seeking an OTSC alleging defendant had violated the June 27, 2017, judgment. In a supporting certification, Tendler, plaintiff's Rabbi, certified defendant was still allowing children to walk between parked cars in the Sixth Street lot when plaintiff was conducting services. On March 6, 2018, the judge entered an order awarding plaintiff $1,000 in sanctions for defendant's interference with plaintiff's easement rights. On March 26, 2018, the judge awarded plaintiff $11,544.63 in attorney's fees incurred as a result of defendant's violation. Defendant filed an amended notice of appeal (NOA) in A-5303-16 challenging the March 6, 2018 order[2] but not the March 26, 2018 order.

On August 23, 2018, while defendant's appeal in A-5303-16 was still pending, defendant filed an application with the ZBA seeking an interpretation

---

[2] Defendant identified a March 8, 2018 order in its amended NOA but since there was no March 8, 2018 order, we presume defendant intended to add the March 6, 2018 order.

A-2790-21

pursuant to N.J.S.A. 40:55D-70(a) and (b) as to whether parking on defendant's property required a variance and site plan approval, or, in the alternative, a certificate pursuant to N.J.S.A. 40:55D-68 as to whether plaintiff's use of the Sixth Street lot for parking was a valid, nonconforming use. On October 15, 2018, following a hearing, the ZBA passed a motion finding plaintiff's use of defendant's property for parking was an illegal non-conforming use.[3] Based on that decision, the following day, defendant applied to the Township for a permit to build a fence on the Sixth Street lot to prevent plaintiff from parking there. The Township attorney authorized the Township to grant defendant's fence permit "with the understanding that any building is at risk."

Plaintiff filed additional applications for an OTSC to enforce litigant's rights. In a June 4, 2018 application, plaintiff alleged defendant continued to violate the June 27, 2017 judgment by allowing children to walk between parked cars in the Sixth Street lot when plaintiff was conducting services. In an October 19, 2018 application, plaintiff sought emergent restraints to have the fence removed as a violation of the June 27, 2017 judgment. Following a preliminary

---

[3] Based on the ZBA's determination, the Township issued plaintiff a notice of violation on October 25, 2018, for having no site plan approval to park on the Sixth Street lot. The ZBA later adopted Resolution No. 4010A on November 19, 2018, memorializing its October 15, 2018 decision, finding that plaintiff's use of defendant's property for parking was an illegal non-conforming use.

hearing on the OTSC related to the fence, on October 19, 2018, the judge determined defendant was in violation of the June 27, 2017 judgment and ordered defendant to remove the fence. After a final hearing, the judge entered an order on February 21, 2019, reiterating his finding regarding the construction of the fence and directing defendant to reimburse plaintiff $550 for the cost of removing the fence. On the same date, the judge awarded plaintiff $2,500 in sanctions in connection with the June 4, 2018 enforcement application. The judge also awarded plaintiff attorney's fees on May 29, 2019, in connection with both OTSC applications.[4]

On June 25, 2019, we issued an unpublished opinion in A-5303-16. We "reverse[d] the order granting partial summary judgment [to plaintiff] due to genuine issues of material fact" regarding "what [property] interest was created, its scope, and whether it remains in effect." Congregation Sons of Israel v. Congregation Meorosnosson, Inc., No. A-5303-16 (App. Div. June 25, 2019) (slip op. at 2, 13). We "vacate[d] all of the other orders under review," and "remand[ed] for further proceedings." Id. at 13.

Remand Trial

---

[4] The judge awarded plaintiff $11,257.50 in counsel fees in connection with the October 19, 2018 application, and $32,966.96 in connection with the June 4, 2018 application.

Prior to the remand trial, defendant moved to disqualify the judge who had granted plaintiff partial summary judgment. On August 26, 2019, after hearing argument, the judge entered an order denying the recusal motion. Defendant moved for reconsideration, which was denied on January 17, 2020. Defendant also moved to compel the return of monies paid pursuant to the trial court's June 27, 2017 and March 6, 2018 orders. Following oral argument, the judge denied defendant's motion in an oral decision and entered a memorializing order on February 5, 2020.

Pre-trial, plaintiff moved in limine to exclude from the trial the transcript of the October 15, 2018 ZBA hearing, the minutes of the October 15, 2018 ZBA hearing, and Resolution No. 4010A memorializing the ZBA's October 15, 2018 determination. The judge granted plaintiff's motion to exclude the ZBA documents but did not bar any party from calling any members of the ZBA to testify. The judge also denied plaintiff's application to rely upon the transcripts of the trial testimony of witnesses who had testified during the 2017 trial and required all witnesses be recalled if the parties intended to rely on their testimony.

The remand trial took place on various dates between January 28, 2020, and August 2, 2021.[5]  The critical factual dispute at trial concerned whether plaintiff's congregants had historically parked in the Sixth Street lot.

Plaintiff's witnesses described the Sixth Street lot as a concrete area located between plaintiff's synagogue and defendant's school.  Plaintiff's congregants usually parked in the Fifth Street lot when there was an activity occurring in the auditorium, as the Fifth Street lot allowed direct access to the lower entrance to the synagogue leading to the auditorium.  However, congregants parked in the Sixth Street lot because it was closest to the main entrance of the "worship portion" of plaintiff's synagogue.  Orthodox Jewish men came to the synagogue to pray "three times a day" and the Sixth Street lot allowed them quick access.  The men usually prayed in groups of "no less than [ten] men" known as "minyan[s]."

According to plaintiff's witnesses, when Hebrew Day operated the school, pick up and drop off of students occurred on Fifth Street.  For example, Harrison Pfeffer, who had lived in Lakewood most of his life, attended the Hebrew Day school.  He testified the bus would drop him and the other students off "on the [Fifth] Street side" and never on the Sixth Street side of the school.  He also

---

[5]  The pandemic caused the delay in the trial proceedings.

testified that the bus almost always picked them up in the afternoon on Fifth Street. Oscar Amanik similarly testified that his sons attended Hebrew Day and the drop off point was on Fifth Street.

Janet Zagorin, a lifelong resident of Lakewood and lifelong member of plaintiff's synagogue, testified that from 1963 to 1969, "it was a normal thing" for congregants to park in the Sixth Street lot. Zagorin did not think there was "a formal, paved driveway" to get into the Sixth Street lot but said there was "an opening in the sidewalk" on Sixth Street for people to enter and park without driving "over the curb." Zagorin testified that plaintiff's congregants also parked in the Fifth Street lot.

Amanik, who had lived in Lakewood since the 1960s, recalled parking in the Sixth Street lot through the 1970s, and recalled seeing other cars parked there as well. He specifically recalled parking in the Sixth Street lot on Yom Kippur in 1973. Beyond that, Amanik recalled taking his father to afternoon services at plaintiff's synagogue and parking in the Sixth Street lot along with other cars because it was closest to the entrance. Amanik testified further that from 2000 to 2015, he frequently parked in the Sixth Street lot along with other cars. Pfeffer similarly testified he parked in the Sixth Street lot as early as 1998.

In 1995, Tendler became plaintiff's Rabbi. Tendler testified that from 1991 to 1995, he was at plaintiff's synagogue several days per week and observed congregants parking in the Sixth Street lot. Once he became plaintiff's Rabbi in 1995, he was at the synagogue every day and saw plaintiff's congregants parking in the Sixth Street lot from then to the present.[6]

When Tendler became plaintiff's Rabbi in 1995, there was only one morning service at 7:30 a.m. Currently, there are three morning services at 7:00 a.m., 7:50 a.m., and 8:15 a.m., as well as an evening service at sundown. The 8:15 a.m. service usually ends around 9:15 a.m. According to Tendler, the buses with children coming to defendant's school usually arrive "about 8:55" a.m., while the third morning service is still ongoing.

Tendler testified he used to "put up cones" each morning at about 6:30 a.m. to prevent his congregants from parking in front of the school in the Sixth Street lot "because the school kept allowing the kids to walk in between the cars." He said he no longer does that because it was defendant's responsibility. Although the school has a crossing guard, Tendler explained the guard does not prevent the children from walking between the cars in the Sixth Street lot.

---

[6] Tendler also stated plaintiff paid the electrical bills associated with all lighting in both the Fifth and Sixth Street lots and provided snow removal for both lots during the winter.

A-2790-21

Jan Wouters, one of the Township attorneys at the time, testified that he received a letter dated July 30, 2013, from defendant's attorney addressed to the Mayor of Lakewood. In the letter, which was admitted into evidence at trial, defense counsel "object[ed] to an ordinance that had been adopted regarding bus parking" on defendant's property and "object[ed] to a curb cut" going into the Sixth Street lot "that he felt was illegal." The Mayor instructed Wouters to respond to "the curb cut issue" only.

In an August 1, 2013 letter admitted into evidence, Wouters responded to defense counsel as follows:

> I will respond to your claim that the curb cut that is present on the property of the Congregation Sons of Israel [to enter the Sixth Street lot] is illegal and creates an unsafe condition. The curb cut you refer to is neither illegal nor unsafe. According to the Township engineer's office the curb cut can be seen on aerial photographs taken of the property in the early . . . 1990s . . . .
>
> While the Township engineer's office does not have in its files any information regarding the initial approval for the curb cut in the early 1990s, there is also no information that would indicate that it was not approved. Also according to the Township engineer, it does not violate any Township ordinances.

Wouters testified that his August 1, 2013 response "was the Township's official position with regard to the curb cut issue."

21

Jeffrey Staiger was the Township engineer when Wouters received the letter from defense counsel. He reviewed the 1993 site plan for the parties' properties and saw a curb cut on both Fifth Street and Sixth Street. He also reviewed aerial photographs that showed the curb cut on Sixth Street since the 1990s, although he could not recall whether the photos he reviewed were "historical aerials or the aerials provided" on the New Jersey Department of Environmental Protection website. Staiger discussed his findings with Wouters prior to Wouters responding to defense counsel's letter.

John Rea, a licensed professional engineer, testified for plaintiff as an expert in traffic engineering. Rea has been employed in the traffic engineering field for forty-seven years. Currently, he conducts traffic impact studies and represents townships in reviewing development applications.

Rea testified that the 1972 site plan for the properties designated the Fifth Street lot as a "paved recreation and parking area." He stated that although the Sixth Street lot was designated on the 1972 site plan as "CONC," which "is an abbreviation for concrete," and did not expressly include any designation for parking, there was no designation prohibiting parking on the Sixth Street lot. Rea also reviewed a 1993 site plan for the parties' properties. The 1993 site plan, which was admitted into evidence, designated the Fifth Street lot as a

22

"[b]ituminous driveway" but did not include any designation for the Sixth Street lot. Rea indicated the 1993 site plan showed a curb cut on both the Fifth Street and Sixth Street lots.

Rea testified the Fifth Street lot "had all of the appearance of a parking lot." He opined the Sixth Street lot also appeared to be a parking lot because "[t]here's concrete pavement in the area off of Sixth Street" and "there's a, what I would classify as a curb cut that permits vehicular access into that area." Rea believed the existence of a curb cut on Sixth Street indicated it was for "ingress or egress" of cars. He also testified he visited the parties' properties three times in 2017 and during his visits, "there was parking on the Sixth Street lot" that was permitted for that purpose. Rea stated that in his opinion, the absence of "the word parking" from the Sixth Street lot on the site plan was not "indicative of whether parking [was] permitted or prohibited there."

Defendant's witnesses refuted plaintiff's account that its congregants had historically parked in the Sixth Street lot.

Chaim Abadi attended the Hebrew Day school from 1963 through 1969 and never observed cars parked in the Sixth Street lot, which he described as a mixture of "concrete and grass." He said he would arrive at the school around 8:30 a.m. and observed school buses parked in front of the school on Sixth

23

Street, but did not "remember that many cars" in the Sixth Street lot "because the buses were always sitting there."

Abraham Bursztyn testified that from the late 1970s through the early 1980s, he never saw any cars parked in the Sixth Street lot from Monday to Friday. Bursztyn lived on Sixth Street across the street from the parties' properties since he was around five years old. Bursztyn said he would leave his house at about 8:55 a.m. for school and there were school buses pulling up to the school and parking on Sixth Street to drop off students by 8:15 a.m. or 8:30 a.m. He confirmed that when students were dropped off for the Hebrew Day school, they had to cross over the Sixth Street lot located in front of the school. He testified there were usually "six or seven" "vans and maybe small buses" that dropped off "for sure 100" students or more. When he returned from school at around 4:00 p.m. or 5:00 p.m., he said "[t]here were never cars there" in the Sixth Street lot.

Throughout the early to mid-1980s, Ezra Goldberg was a student at the Hebrew Day school and did not recall seeing any cars in the Sixth Street lot at any time. Goldberg testified that instead, the Sixth Street lot was filled with schoolchildren. Abraham Halberstam, who moved to Lakewood in the late 1980s and resided on Fifth Street, did not recall ever seeing cars parked on the

24

Sixth Street lot in the 1990s. He did not think the Sixth Street lot was a parking lot and noted it did not have any striping, a fire lane, or a driveway for entering and exiting. He testified that cars would enter and exit the Sixth Street lot through "a curb cut of some sort."

Around 2009, Bursztyn started working for defendant. Bursztyn testified plaintiff's congregants began parking in the Sixth Street lot around August 2010 after defendant bought the property from the bankruptcy sale. He acknowledged some parents whose children attended defendant's school may have used the Sixth Street lot. However, Bursztyn testified plaintiff "created a driveway" by "chisel[ing] out the curb" to allow its congregants access to the Sixth Street lot.

Alexander Litwornia testified for defendant as an expert in traffic engineering. Litwornia has designed parking lots and appeared before planning boards on various projects. He visited the parties' properties "[p]robably four or five" times to "see how the circulation worked at the time of loading and unloading of the students."

Litwornia testified there was no reference to parking on the Sixth Street lot on the 1972 site plan. According to Litwornia, "when [he] visited the site," there was no "properly installed curb cut with radiuses" on Sixth Street. Instead, he saw "regular curbing that was chipped out so it took the bump out" in order

to get into the Sixth Street lot. He said "[i]t was done ad hoc" and "not done properly no matter which way you look at it."

Litwornia testified cars parked in the Sixth Street lot would inhibit fire trucks from getting to the school on defendant's property. He also said the Sixth Street lot contained no lines showing where to park and did not have any arrows on the concrete showing what direction cars should travel, which was "not common." According to Litwornia, the Sixth Street lot had "no depressed curb," "no parking stalls shown," and "no handicapped parking space or signs showing." In Litwornia's opinion, if the Sixth Street lot was a parking lot, "it was an illegal parking lot."[7]

Andrew Thomas testified for defendant as an expert in city and regional planning. He has worked for several companies as a planning consultant and has represented several municipalities. He also visited the properties several times, most recently on November 6, 2019.

Thomas testified the 1972 site plan did not indicate a parking lot on the Sixth Street lot. He also testified there was nothing in the 1972 site plan to

---

[7] During cross examination, Litwornia admitted that in the 2017 trial, he had testified that it was possible to figure out a way to legally park in the Sixth Street lot.

A-2790-21

indicate a curb cut to enter the Sixth Street lot. In his opinion, the absence of the word "parking" and the absence of a curb cut on the 1972 site plan indicated that the Sixth Street lot was not a parking lot and should not be used for parking. Thomas admitted, however, that the 1972 site plan does not show any lines or a curb cut on the Fifth Street lot either despite being designated for parking.[8] Thomas further acknowledged the omission of a specific reference to parking on a site plan "doesn't mean it's specifically excluded."

Thomas visited the properties from around 7:30 a.m. to 9:00 a.m. Between 7:30 a.m. and 7:45 a.m., he observed "about [four] or [five] cars" in the Sixth Street lot, but "as time went on, . . . the number of cars increased" in the Sixth Street lot. According to Thomas, "at the highest peak there [were] approximately [nineteen] cars" parked in the Sixth Street lot. In Thomas's opinion, the Sixth Street lot is "a concrete courtyard that []is now being utilized as parking" by plaintiff's congregants. Thomas acknowledged however that pursuant to Lakewood ordinances, parking is a "[p]ermitted accessory use" in the zone where the properties are located.

---

[8] Thomas also testified he was not aware of any handicapped parking or designated fire lanes in the Fifth Street lot either.

A-2790-21

Following the trial, the judge entered an order on March 29, 2022, finding the 1963 agreement created an express easement for plaintiff to park on defendant's property and for plaintiff to access defendant's property to service its HVAC system. In an accompanying written opinion, the judge relied on "the credible testimony and evidence adduced at trial and from the uncontested facts set forth in the record." After examining "the plain language of the instrument and examining the surrounding circumstances," the judge concluded the parties intended to create an easement as opposed to a revocable license, "the easement was not extinguished or abandoned," and the easement would "run with the land" and continue to exist for as long as plaintiff maintains an Orthodox Jewish synagogue.

The judge explained:

> Th[e surrounding] circumstances include themes within the [a]greement that demonstrate an intent that the synagogue remain independent and operate indefinitely. Other circumstances include an examination of the physical plan referenced in the [a]greement and the concomitant needs for the synagogue's successful operation. Finally, the [c]ourt considered the conduct of the parties after executing the [a]greement and later after the [a]greement was recorded.

The March 29, 2022 order was amended on April 26, 2022.

A-2790-21

Defendant filed a NOA identifying the April 26, 2022, March 29, 2022, February 5, 2020, January 17, 2020, August 26, 2019, June 5, 2019 orders, and the two May 29, 2019 and two February 21, 2019 orders as the subjects of the appeal in A-2790-21.

Prerogative Writs Action

Prior to the remand proceedings, plaintiff filed a complaint in lieu of prerogative writs against the Township and the ZBA, seeking to reverse the ZBA's October 15, 2018 determination, memorialized on November 19, 2018, in Resolution No. 4010A, providing that plaintiff's use of the Sixth Street lot for parking was an illegal non-conforming use. Plaintiff later amended the complaint, adding defendant. All three defendants filed contesting answers to plaintiff's amended complaint, and defendant filed a counterclaim seeking an order affirming Resolution No. 4010A and declaring plaintiff's parking on the Sixth Street lot illegal.

Prior to the final hearing, defendant moved in limine to limit the record to defendant's 2018 application, which motion was denied on May 24, 2019.[9] By way of background, defendant had previously submitted two separate

_____

[9] A memorializing order was entered on June 2, 2022. The delay in entering the order was due to an administrative oversight.

applications to the ZBA in relation to plaintiff parking on its property. In 2016, defendant had sent a letter to the Township's zoning officer seeking a determination that the Board's variance and site plan approval of Hebrew Day's 1972 application did not permit parking by anyone on the Sixth Street lot. When the zoning officer declined to make that determination, defendant applied to the ZBA seeking the same determination pursuant to N.J.S.A. 40:55D-70(b). Plaintiff opposed the application.

Jerry Dasti, the ZBA's attorney at the time, advised that the ZBA did not have jurisdiction "to interpret [z]oning [r]esolutions which were adopted at least [thirty] years ago" and were the subject of ongoing "litigation in the Superior Court." After a hearing, relying on counsel's advice, the ZBA rejected defendant's application to interpret the Board's 1972 approval and memorialized its decision in Resolution No. 4010, adopted on January 8, 2018. Defendant subsequently filed a complaint in lieu of prerogative writs against the ZBA appealing Resolution No. 4010, and the ZBA joined plaintiff as a party to that action. On August 17, 2018, the trial judge granted summary judgment in favor of plaintiff and the ZBA, finding the ZBA lacked jurisdiction to hear the application and dismissing defendant's complaint with prejudice. Defendant did not appeal the August 17, 2018 order memorializing the decision but sought to

preclude any reference to this prior application in the hearing on Resolution No. 4010A.[10]

Following the final hearing on Resolution No. 4010A, the judge issued a written opinion on December 1, 2022, finding the ZBA lacked jurisdiction to hear defendant's application, exceeded its statutory authority, and improperly shifted the burden of proof to plaintiff. Thus, the judge determined the ZBA's decision to pass Resolution No. 4010A "was arbitrary, capricious, . . . unreasonable" and "not supported by the facts or law." On the same day, the judge entered judgment in favor of plaintiff, finding Resolution No. 4010A null and void, and dismissing defendant's counterclaim with prejudice. The judge also ordered the notice of violation issued on October 25, 2018, by the Lakewood Code Enforcement Officer against plaintiff in reliance on Resolution No. 4010A withdrawn as "a nullity."

The judge explained that "[c]ritical to th[e] analysis [was] the demonstration that the use was a conforming and permitted use, but that a change in ordinance rendered it nonconforming." However, after reviewing the

_____

[10] Defendant asserted before the trial court and reiterates on appeal that only its own exhibits were before the ZBA. However, plaintiff submitted voluminous exhibits in its opposition to defendant's first application and specifically incorporated those documents in its opposition to defendant's second application.

A-2790-21

current zoning ordinances and regulations governing uses of the property, the judge found defendant "submitted no proofs that [p]laintiff's use of the Sixth Street lot [was] not a permitted use on the [p]roperty under current regulations or ordinances."

The judge elaborated:

> There is no showing before the ZBA that a change in the zoning code rendered the act of parking vehicles pursuant to a long-standing easement had been adversely affected. Instead, [defendant] sought and apparently obtained from the ZBA an opinion that [plaintiff] had never been approved by site plan, that the parking had not been continuous, and that the easement was ineffective. The ZBA had no authority to make such a determination, especially since [the judge] had made a ruling . . . [in the easement litigation] that was binding upon the parties.

The judge added the Board "exceeded its statutory authority by acting as an enforcement agency" and "concluding that [p]laintiff was required to obtain site plan approval in order to utilize the Sixth Street lot for parking, even though parking is a permitted accessory use to a house of worship under the Township's zoning ordinance."[11] According to the judge, by its actions, "the Board

---

[11] The judge elaborated that Sections 18-905 and 18-906 of the Lakewood Zoning Ordinance "pertain[] to parking and buffer requirements" for places of worship and public and private schools respectively and that "neither section

impermissibly acted as an enforcement authority under N.J.S.A. 40:55D-18" but "[o]nly the Township has the power to enforce its zoning ordinances."[12]

Defendant filed an amended NOA, identifying the June 2, 2022 order denying its motion in limine, and the December 1, 2022 judgment in plaintiff's favor as the subjects of the appeal in A-1339-22.[13]

II.

Easement Appeal

In A-2790-21, defendant argues plaintiff's evidence at trial failed to meet its burden to prove that the 1963 agreement established an easement to park on defendant's property. Instead, defendant argues the trial evidence only demonstrated the creation of a license which had terminated. Defendant asserts

---

prohibits parking on the Sixth Street lot." See Lakewood, N.J., Code §§ 18-905 and 18-906.

[12] See N.J.S.A. 40:55D-18 (noting under the Municipal Land Use Law (MLUL), "[t]he governing body of a municipality shall enforce this act and any ordinance or regulation made and adopted hereunder"); see also Paruszewski v. Twp. of Elsinboro, 154 N.J. 45, 52 (1998) ("The MLUL grants townships exclusive powers to enforce the Law.").

[13] In a letter of non-participation, the ZBA indicated it was not participating in A-1339-22. Although the Township filed a responding brief, it noted it had "no dog in this fight," that none of defendant's arguments on appeal were directed toward it, and it would continue to adhere to the court's rulings.

even if the 1963 agreement created an easement, plaintiff expanded and exceeded the bounds of the easement.

Our review of a judgment following a bench trial is limited. Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011). We "give deference to the trial court that heard the witnesses, sifted the competing evidence, and made reasoned conclusions." Griepenburg v. Twp. of Ocean, 220 N.J. 239, 254 (2015). Indeed, "[r]eviewing appellate courts should 'not disturb the factual findings and legal conclusions of the trial judge' unless convinced that those findings and conclusions were 'so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Ibid. (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). On the other hand, "[c]onclusions of law are subjected to the normal de novo review on appeal." Ibid. See Rowe v. Bell & Gossett Co., 239 N.J. 531, 552 (2019) ("A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." (quoting Manalapan Realty, L.P. v. Twp. of Manalapan, 140 N.J. 366, 378 (1995))).

At the heart of this case are the legal principles governing easements and licenses. "[A]n easement is defined as a nonpossessory incorporeal interest in

another's possessory estate in land, entitling the holder of the easement to make some use of the other's property." Leach v. Anderl, 218 N.J. Super. 18, 24 (App. Div. 1987). The existence of an easement "obligates the possessor not to interfere with the uses authorized by the easement." Caribbean House, Inc. v. N. Hudson Yacht Club, 434 N.J. Super. 220, 226 (App. Div. 2013) (quoting Restatement (Third) of Prop.: Servitudes, § 1.2 (A.L.I. 2000)). "The proponent of the easement must establish the elements by the preponderance of the evidence." Yellen v. Kassin, 416 N.J. Super. 113, 120 (App. Div. 2010). "No particular words are necessary to constitute the grant of an easement; any words which clearly show the intention to give an easement are sufficient to effect that purpose, provided the language is certain and definite in its terms." Borough of Princeton v. Bd. of Chosen Freeholders, 333 N.J. Super. 310, 324 (App. Div. 2000), aff'd, 169 N.J. 135 (2001).

"Questions concerning the extent of the rights conveyed by an easement require a determination of the intent of the parties as expressed through the instrument creating the easement, read as a whole and in light of the surrounding circumstances." Rosen v. Keeler, 411 N.J. Super. 439, 451 (App. Div. 2010); see also Hammett v. Rosensohn, 26 N.J. 415, 423 (1958) ("[T]he intent of the conveyor [of an easement] is normally determined by the language of the

conveyance read as an entirety and in the light of the surrounding circumstances."). "[W]hen there is any ambiguity or uncertainty about an easement grant, the surrounding circumstances, including the physical conditions and character of the servient tenement, and the requirements of the grantee, play a significant role in the determination of the controlling intent." Khalil v. Motwani, 376 N.J. Super. 496, 503 (App. Div. 2005) (quoting Hyland v. Fonda, 44 N.J. Super. 180, 187 (App. Div. 1957)).

As set forth in Leach, factors that indicate an easement as opposed to another interest has been created include:

> (1) the fact that it is an interest in land which is in the possession of another; (2) the content of the interest as a "limited" use or enjoyment of the land in which the interest exists; (3) the availability of protection of the interest as against interference by third persons; (4) the absence of terminability at the will of the possessor of the land; (5) the fact that it is not a normal incident of a possessory land interest, and (6) the fact that it is capable of creation by conveyance.
>
> [Id. at 24 (quoting Town of Kearny v. Mun. Sanitary Landfill Auth., 143 N.J. Super. 449, 459 (Law Div. 1976)).]

An easement may "be created for a fixed term or for the accomplishment of a specific purpose," although the "extent of the easement created by a conveyance is fixed by the conveyance." Eggleston v. Fox, 96 N.J. Super. 142,

147 (App. Div. 1967). An intent for an easement to expire may be expressed "by any appropriate words," but is "usually manifested by a limitation which contains the words, 'so long as,' 'until' or 'during,' or a provision that upon the happening of a stated event" the interest will expire. Id. at 146.

An easement is subject to modification or termination by agreement of the parties or as a result of "abandonment, prescription, merger, or estoppel." Van Horn v. Harmony Sand & Gravel, Inc., 442 N.J. Super. 333, 345 (App. Div. 2015). However, "[o]nly the holder of the easement is able to unilaterally terminate an easement through renunciation." Ibid. Further,

> to establish the abandonment of an easement, the party asserting such abandonment must present clear and convincing evidence of an intention on the part of the owner to abandon the easement or must prove conduct on the part of the owner of the servient tenement adverse to and defiant of the easement and which conduct acquiesced in by the owner of the easement was the cause of the non-user. In the absence of facts which could give rise to an equitable estoppel, the conduct and acts adverse to the easement must have continued uninterrupted for the full period of [twenty] years.
>
> [Fairclough v. Baumgartner, 8 N.J. 187, 189-90 (1951).]

On the other hand, a license is an interest in land with "less than an exclusivity of possession." Kearny, 143 N.J. Super. at 456. "[A] license is an

37

agreement that only gives permission to use the land at the owner's discretion." Van Horn, 442 N.J. Super. at 341. "A license does not provide protection for the licensee against interference by the licensor." Ibid. "A license is simply a personal privilege to use the land of another in some specific way or for some particular purpose or act." Twp. of Sandyston v. Angerman, 134 N.J. Super. 448, 451 (App. Div. 1975). See Kearny, 143 N.J. Super. at 456 ("A license confers authority to go upon the land of another and do an act or series of acts there, but it does not give rise to an estate in land.").

A license is "usually freely revocable at the owner's pleasure," is limited in scope by the granting agreement, and terminates at the death of either party. Van Horn, 442 N.J. Super. at 341. A license is also subject to revocation "by a conveyance of the land upon which it was intended to operate." Kiernan v. Kara, 7 N.J. Super. 600, 603 (Ch. Div. 1950). A license "becomes irrevocable if the licensee expends substantial sums of money pursuing the privilege while the licensor acquiesces to the expenditures, or if permitting revocation would permit the licensor to practice a fraud on the licensee . . . ." Van Horn, 442 N.J. Super. at 342.

Here, the 1963 agreement conveyed to plaintiff "an unencumbered fee title to the lands and premises comprising the . . . corner of Sixth Street and Madison

Avenue" and gave the specific dimensions of the property being conveyed. It also provided that plaintiff must use the conveyed land to build the synagogue according to Hebrew Day's specifications and plans and in accordance with Orthodox Jewish tenets. The agreement further stated that Hebrew Day agreed "to permit [plaintiff] to utilize for parking purposes the vacant lands it owns on Madison Avenue and also on Sixth Street and to permit use of lands on Sixth Street for boiler room use and for a water cooling tower."

When we reversed the order granting plaintiff partial summary judgment, we determined the language in the 1963 agreement did "not definitively establish an easement" and the use of "the term 'permission'" in paragraph ten was "ambiguous as to whether the interest may be something other than an exclusive grant." Congregation Sons of Israel, slip op. at 10. We also noted "[p]aragraph ten [did] not include language establishing a right in perpetuity nor [did] it include language limiting performance to Hebrew Day . . . ." Id. at 11. We explained "[e]ven if a perpetual easement was established by the 1963 agreement, an issue of material fact remain[ed] as to whether it has been abandoned." Id. at 12. We underscored "[b]ecause the 1963 agreement is ambiguous, surrounding circumstances may be addressed." Ibid.

A-2790-21

Following the remand trial, the judge analyzed the surrounding circumstances as well as the language of the agreement to infer the original parties' intent. Rosen, 411 N.J. Super. at 451. The judge made copious factual findings which he applied to the governing legal principles. Based on his analysis, the judge determined the 1963 agreement intended to create an easement rather than a license. We are satisfied the judge's findings are amply supported by substantial, credible evidence in the record. Griepenburg, 220 N.J. at 254.

Critically, the judge applied the six Leach factors used by courts to distinguish an easement from other interests and found "the subject property easily meets all of the criteria." Specifically, the judge found the Sixth Street lot was in defendant's possession, and the 1963 agreement gave plaintiff the "limited use" of defendant's land for parking. Leach, 218 N.J. Super. at 24. Further, the agreement provided "off-street parking" protected against interference "from other third-party interests," the privilege to park on the Sixth Street lot was not an "ordinary incident of possession of [p]laintiff's property," and the privilege was capable of creation by conveyance. Ibid.

In addition, the judge found no evidence the interest was intended to be terminable at will. Ibid.; Van Horn, 442 N.J. Super. at 341. In that regard,

A-2790-21

multiple witnesses testified plaintiff's congregants parked on the Sixth Street lot when the agreement was executed in 1963 and continued to do so for decades after without any objection or revocation from Hebrew Day. Moreover, the 1963 agreement's purpose was to convey land to plaintiff to create and operate a synagogue independently from Hebrew Day to "perpetually be maintained in accordance with Orthodox Jewish tenets." From this language, the judge found "it is not unreasonable to conclude that the parking rights would be conveyed similarly, that is, as long as the synagogue is in operation."

The judge further found "[v]arious terms of the [1963 a]greement imply that the synagogue was intended to exist independently and for an indefinite period of time" which "impl[ies] that the parties intended the parking rights be equally durable and permanent, more akin to those property rights associated with an easement as opposed to a revocable license." For instance, the judge pointed out the 1963 agreement "require[d] the synagogue to make contributions to the [Hebrew Day school] but provides that those contributions end if the school ceases operation or changes management," demonstrating "the intent that the synagogue was planned to exist independently and continue without the school" and evidencing "an intent by the parties to prioritize the interests of the

41

synagogue over the school."  Further, "there was no requirement that members of the synagogue attend the [Hebrew Day school]."

Thus, the judge found it was

> unreasonable to conclude that the parking rights would have been conveyed as a revocable license dependent on the continued operations and good will of [Hebrew Day] while the [a]greement provided for the independent and indefinite operation of the synagogue. This is particularly true given the provision in the [a]greement that insulate . . . [p]laintiff should the school's operations cease.  This evidence supports the conclusion that the parking and water rights were intended to be conveyed as an easement and were intended for the [Sixth] Street Lot.

The judge found further support for his conclusion in the different uses and the "planned physical layout of the synagogue."  When the 1963 agreement was executed, plaintiff had no viable place for on-site, off-street parking on the land conveyed to it by Hebrew Day.  As the trial testimony demonstrated, the nature of plaintiff's operation required congregants to be able to access the synagogue to pray multiple times per day and the entrance leading to the prayer area of the synagogue was most readily accessible by the Sixth Street lot.  By contrast, the Fifth Street lot provided access to the auditorium for the community-based functions at the synagogue.  The 1963 agreement specifically delineated two separate areas for plaintiff's parking that would accommodate

42

both prayer-based and community-based needs, supporting the notion that a more durable parking interest such as an easement was essential to the operation of the synagogue. See Khalil, 376 N.J. Super. at 503 (noting the "requirements of the grantee[] play a significant role in the determination of the controlling intent"). Thus, the judge "concluded from the evidence that the parties recognized the synagogue's parking needs and approved a plan that intended the [Sixth] Street lot to provide short term convenient access to the [synagogue], while the [Fifth] Street lot was to accommodate the community center."

The judge also examined the parties' course of conduct as elicited through the trial testimony to glean the parties' intent. In that regard, the judge credited plaintiff's witnesses' testimony that parking in the Sixth Street lot continued from 1963 until the present, and rejected as "[un]persuasive" and "unavailing" defendant's witnesses' account that parking was not permitted in the Sixth Street lot. The judge found the continued use of the Sixth Street lot after the 2007 recording of the 1963 agreement provided further corroborative evidence of an easement as Hebrew Day "made no formal objection nor took any formal action to dispute [p]laintiff's use or claims as reflected in the 2007 recorded easement."

Plaintiff's witnesses also testified that there was a curb cut on Sixth Street to allow people to freely enter and leave the lot. After analyzing the evidence,

43

including the testimony of plaintiff's and defendant's expert and fact witnesses as well as the exhibits admitted at trial, the judge found "the disputed curb cut has been in existence since at least 1993." The judge added "the lot could be used for parking without the cut."

The trial testimony supported the judge's finding that plaintiff's congregants "regularly parked [in the Sixth Street lot] from 1963 through present time," conduct which "supports the existence of parking rights on the [Sixth] Street [l]ot and that the right was understood by the parties at the time of the conveyance and after." See Joseph Hilton & Assocs., Inc. v. Evans, 201 N.J. Super. 156, 171 (App. Div. 1985) (noting the conduct of the parties after entering into an agreement is "entitled to great weight in determining its meaning.").

The judge explained:

> [T]his [c]ourt concludes from the totality of the evidence that the language of the 1963 Agreement reflects an intent to convey an easement for [p]laintiff to park on the [Sixth] Street [l]ot during services and to access the boiler room on the [Sixth] Street property to service and maintain its HVAC. The [c]ourt comes to this conclusion after considering the language of the Agreement, all of the surrounding circumstances including the physical layout of the synagogue together with the needs attendant of the [synagogue]. This conclusion is further supported by the conduct of the parties for over fifty years of using the [Sixth] Street

44

[l]ot without [Hebrew Day] making any formal objection.

Because the judge found the Sixth Street lot had been used "continuously" and "regularly for parking since 1963," the finding was "dispositive of the issue of abandonment." The judge further found the intended duration of the easement conveyed in the 1963 Agreement was "intended to benefit . . . [p]laintiff as long as the property was operated as a synagogue and this property right was not intended to be limited to [defendant's predecessor], but to run with the land binding all successors in title."

Defendant asserts a key circumstance showing the 1963 agreement was not an easement was its lack of formality. However, our courts have stressed that a "lack of formalities" argument improperly seeks to "elevate form over substance, which violates the principle that we interpret agreements to determine the intent of the parties, rather than focus solely on the language used." Van Horn, 442 N.J. Super. at 344 (rejecting argument that an agreement was too informal "to convey a profit," which is analogous to an easement).

Further, the 1963 agreement, which was recorded in 2007 as an easement for parking, described with specificity the property Hebrew Day conveyed to plaintiff, as attested to by both Hebrew Day's and plaintiff's presidents at the time and witnessed by their respective secretaries. Thus, defendant was on

notice when it bought the property in 2010 that the 1963 agreement existed. See N.J.S.A. 46:26A-12(a) ("[A]ny recorded document affecting the title to real property is . . . notice to all subsequent purchasers . . . of the document recorded and its contents.").

Defendant argues plaintiff did not establish the intent of the parties in 1963 or thereafter was to create a "permanent" easement. First, the judge did not find the easement was permanent or perpetual, but that it would last for as long as plaintiff operated its synagogue consistent with Orthodox Jewish tenets. Second, as the judge found, plaintiff's witnesses amply demonstrated through their testimony that there was always parking in the Sixth Street lot since the agreement was executed in 1963 and that there was a curb cut for ingress and egress. Indeed, defendant's own witnesses admitted that even though the 1972 site plan did not specifically designate the Sixth Street lot as a parking area, that alone did not prohibit parking there.

Defendant asserts the surrounding circumstances and facts from the remand trial prove that the 1963 agreement created a license that ended "no later than 1972." However, plaintiff's witnesses provided credible testimony that there was continued parking on the Sixth Street lot well after 1972. Thus, Hebrew Day did not revoke plaintiff's parking rights at that time. Further, Rabbi

Tendler testified plaintiff paid the electrical bills associated with the lights on both the Fifth and Sixth Street lots for "[a]s long as [he could] remember." Tendler also testified plaintiff arranged for snow removal from both lots. Defendant never objected to plaintiff incurring these expenses to maintain either lot. Expenditures made by plaintiff to maintain the parking areas further support plaintiff's position because even if the 1963 agreement only gave plaintiff a license to use the property, a license can become irrevocable "if the licensee expends substantial sums of money pursuing the privilege while the licensor acquiesces to the expenditures . . . ." Van Horn, 442 N.J. Super. at 342.

The judge analyzed the surrounding circumstances of the 1963 agreement as we directed, including themes within the agreement itself, the needs for plaintiff's successful operation, and the conduct of the parties. The judge concluded the agreement intended to create a more durable interest than a license. In finding the 1963 agreement created an easement, the judge rejected the "undisputable facts" defendant now cites to refute plaintiff's case. We defer to the judge's findings which are amply supported by credible evidence in the record. See Rova Farms Resort, Inc., 65 N.J. at 483-84 (noting the deferential standard of review of the trial court's factual findings on appeal from a bench trial, particularly where "matters of credibility are involved").

47

Defendant argues that even if the 1963 agreement did convey an easement, plaintiff expanded and exceeded its rights under the easement by adding additional services since 1963. When plaintiff's synagogue first opened in 1963, there was one morning service and an evening service at sundown. Rabbi Tendler testified that the morning services have since increased to three services.

In rejecting defendant's argument, the judge found "[b]ased on the totality of the evidence" that "the parking rights were not limited to one morning service" as "[t]he parties surely intended for the synagogue to thrive and recognized that the number and hours of the services would change and increase." The judge also found "that the evidence demonstrated the original parties prioritized the interests of the synagogue." The judge explained:

> The evidence showed that the school did not need to make use of the Sixth Street lot for parking—the evidence showed that the buses and parents were able to drop the children at the curb on Sixth Street as well as Fifth. There was no demonstrated need for the school to have . . . short-term parking at the lot. There was also insufficient evidence that the school uses conflicted with the synagogue's parking during services.

The judge concluded "in those limited times when the synagogue and the school's use of the Sixth Street lot conflicted, the synagogue would receive priority for parking."

A-2790-21

The "extent of the easement created by a conveyance is fixed by the conveyance." Eggleston, 96 N.J. Super. at 147. "[T]he servient tenement will not be burdened to a greater extent than was contemplated or intended at the time of the creation of the easement . . . and the use of the easement must not unreasonably interfere with the use and enjoyment of the servient estate." Hyland, 44 N.J. Super. at 189 (omission in original) (quoting Lidgerwood Ests., Inc. v. Pub. Serv. Elec. & Gas Co., 113 N.J. Eq. 403, 407 (N.J. Ch. 1933)). When no limitation is placed on the extent of the use of an easement, it may be used for all reasonable purposes. Caribbean House, Inc., 434 N.J. Super. at 226-27.

Here, the judge's ruling that plaintiff's parking rights were not limited to one morning service is supported by the record. The 1963 agreement does not limit the use of plaintiff's parking to only one morning service. In the absence of any limitation on the extent of plaintiff's parking rights in the 1963 agreement, utilizing its parking rights for its congregants to attend more services is a reasonable purpose. Ibid. Thus, plaintiff has not unlawfully expanded on its

easement right and the judge did not preclude defendant from all use of the Sixth Street lot as it asserts.[14]

Defendant argues the judge erred in granting plaintiff's in limine motion excluding from evidence at the remand trial the ZBA's documents memorializing its decision that plaintiff's use of defendant's property for parking was an illegal non-conforming use. Specifically, the excluded documents consisted of the transcript of the October 15, 2018 ZBA hearing, the minutes of the ZBA hearing, and the November 19, 2018 ZBA resolution.

We defer to a trial court's evidentiary rulings absent an abuse of discretion. Rowe, 239 N.J. at 551. An abuse of discretion occurs when "there has been a clear error of judgment." Ibid. (quoting Griffin v. City of East Orange, 225 N.J. 400, 413 (2016)). "Accordingly, 'we will reverse an evidentiary ruling only if it "was so wide [of] the mark that a manifest denial of justice resulted."'" Id. at 551-52 (alteration in original) (quoting Griffin, 225 N.J. at 413). "As to issues

---

[14] Contrary to defendant's assertion, the only conflict between the synagogue's and the school's use of the Sixth Street lot occurred during the third morning service. However, according to plaintiff's witnesses, defendant did not have to use the Sixth Street lot during the service as the children were dropped off for school on Fifth Street. Moreover, defendant provided no evidence that its school was being prevented from using either lot as even defendant's witnesses confirmed that some parents would pull into the Sixth Street lot to drop off and pick up students and were not prevented from doing so by plaintiff.

of law, however, our review is de novo . . . ." Id. at 552 (citing Manalapan Realty, L.P., 140 N.J. at 378). "We apply the same standard of review to in limine motions adjudicating the admissibility of evidence." Primmer v. Harrison, 472 N.J. Super. 173, 187 (App. Div. 2022).

In excluding the evidence, the judge found the transcript of the October 15, 2018 hearing "c[a]me within the definition of hearsay without any exception." The judge explained that during the hearing, "there was no sworn testimony offered." Instead, "the members commented on the application and concluded that historic usage of the subject parking was invalid." Acknowledging that some of the board members may have relevant information, the judge allowed the parties "to call them as witnesses at th[e] trial," but excluded the hearing transcript as inadmissible hearsay. Regarding the resolution, the judge found the ZBA's determination had "no relevance to th[e c]ourt's determination of property rights, whether they existed, the extent of those property rights, and whether they were terminated." Thus, the judge excluded the resolution because "it [was] not relevant to the determinations the [c]ourt ha[d] to make." We discern no abuse of discretion in the judge's ruling.

Our rules of evidence define hearsay as "a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party

offers in evidence to prove the truth of the matter asserted in the statement." N.J.R.E. 801(c). Hearsay is presumptively inadmissible unless an exception applies. N.J.R.E. 802. "The hearsay prohibition ensure[s] the accuracy of the factfinding process by excluding untrustworthy statements, such as those made without the solemnity of the oath, and not subject to cross-examination . . . or the [fact-finder's] critical observation of the declarant's demeanor and tone." James v. Ruiz, 440 N.J. Super. 45, 60 (App. Div. 2015) (first alteration in the original) (quoting Neno v. Clinton, 167 N.J. 573, 579 (2001)). "In addition, there can be an aspect of unfairness, even in civil cases, in the substantive admission of hearsay statements by an absent declarant, without affording the opposing party a chance to cross-examine that person before the fact-finder." Ibid.

A trial court also has "broad discretion in determining the relevance of evidence." Verdicchio v. Ricca, 179 N.J. 1, 34 (2004). Relevant evidence is evidence "having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401. To decide whether evidence is relevant, "the trial court should focus on 'the logical connection between the proffered evidence and a fact in issue . . . or the tendency

of evidence to establish the proposition that it is offered to prove.'" Griffin, 225 N.J. at 413 (quoting Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)).

Here, as the judge correctly found, there was no sworn testimony taken at the ZBA hearing. In discussing the issues surrounding the properties, the ZBA members' statements were neither sworn nor subject to cross-examination. Because the statements were being offered by defendant for their truth, they are hearsay, N.J.R.E. 801(c), and defendant offered no exception to allow their admission. See N.J.R.E. 802; James, 440 N.J. Super. at 60. Defendant also failed to avail itself of the opportunity to call the ZBA members as witnesses at the trial.

As the judge correctly noted, the only issues on remand were the property rights created by the 1963 agreement. See Congregation Sons of Israel, slip op. at 13. The ZBA's resolution was not relevant to those issues, particularly since plaintiff had instituted a separate action seeking to invalidate the resolution which was pending before a different judge at the time of the remand trial. See Griffin, 225 N.J. at 413.

Defendant argues the judge failed to follow our remand instructions and "erroneously tried and decided the issues as a continuation of the 2017 trial and decision." We are unpersuaded by defendant's argument.

A-2790-21

"It is beyond dispute that a trial judge has the responsibility to comply with pronouncements of an appellate court." Tomaino v. Burman, 364 N.J. Super. 224, 232 (App. Div. 2003). "It is the peremptory duty of the trial court, on remand, to obey the mandate of the appellate tribunal precisely as it is written." Id. at 233 (quoting Jersey City Redev. Agency v. Mack Props. Co. No. 3, 280 N.J. Super. 553, 562 (App. Div. 1995)). "Although trial judges are privileged to disagree with our decisions, 'the privilege does not extend to non-compliance.'" Ibid. (quoting Reinauer Realty Corp. v. Paramus, 34 N.J. 406, 415 (1961)). As such, a "trial court has no discretion when a mandate issues from an appellate court. It simply must comply." Ibid.

Here, the judge meticulously followed our remand mandate. At the beginning of his trial decision, the judge noted that "[o]n remand, the parties stipulated that the only remaining issues to be decided at trial were (a) the nature of the [p]laintiff's property rights; and (b) whether those rights were abandoned or terminated."[15] In finding the 1963 agreement created an easement, the judge

---

[15] At a pretrial hearing, the judge had specified the scope of the remand trial, consistent with his subsequent written decision, and inquired whether "[a]nybody disagree[d]." Defendant raised no objection. Defendant cannot now complain about the way the remand trial was conducted when it consented to the procedure and raised no objection when it had an opportunity to do so. See Spedick v. Murphy, 266 N.J. Super. 573, 593 (App. Div. 1993) ("A party who

heeded our direction that the language of paragraph ten of the agreement was ambiguous, and thus made his decision by painstakingly examining not only the plain language of the agreement but also the surrounding circumstances. The judge therefore "obey[ed] the mandate of the appellate tribunal precisely as it [wa]s written." Tomaino, 364 N.J. Super. at 233.

We did not, as defendant asserts, remand for a new trial on all issues. Instead, we specifically remanded for "further proceedings" to determine the discrete issues of "what interest was created [by the 1963 agreement], its scope, and whether it remains in effect." Congregation Sons of Israel, slip op. at 13. The judge did exactly that. Moreover, at the start of the remand trial, the judge denied plaintiff's motion to introduce the transcripts of witnesses from the 2017 trial and instead ordered that all prior witnesses must be recalled, further demonstrating the judge's intent to follow our remand instructions and review the interest created by the 1963 agreement anew.

Defendant argues the judge should have granted its disqualification motion and recused himself on the remand trial because the judge had made prior credibility determinations in the case. We disagree.

---

consents to, acquiesces in, or encourages an error cannot use that error as the basis for an objection on appeal.").

The decision to grant or deny a motion for disqualification is "entrusted to the sound discretion of the judge and [is] subject to review for abuse of discretion." Goldfarb v. Solimine, 460 N.J. Super. 22, 30 (App. Div. 2019) (quoting State v. McCabe, 201 N.J. 34, 45 (2010)), aff'd as modified, 245 N.J. 326 (2021). Motions for recusal of a judge are governed by Rule 1:12-1 and Rule 1:12-2, as well as by statute pursuant to N.J.S.A. 2A:15-49. Magill v. Casel, 238 N.J. Super. 57, 62 (App. Div. 1990). Rule 1:12-2 authorizes a party to file a motion seeking to disqualify the judge presiding over the case. Casel, 238 N.J. Super. at 63. Rule 1:12-1 provides conditions where a judge "shall be disqualified on the court's own motion" including if the judge "has given an opinion upon a matter in question in the action." R. 1:12-1(d); see also N.J.S.A. 2A:15-49(c) (same). "[W]e review de novo whether the judge applied the proper legal standard." Goldfarb, 460 N.J. Super. at 30.

Overall, "[j]udges must avoid actual conflicts as well as the appearance of impropriety to promote confidence in the integrity and impartiality of the Judiciary." DeNike v. Cupo, 196 N.J. 502, 507 (2008). "[A]n appearance of impropriety is created when a reasonable, fully informed person observing the judge's conduct would have doubts about the judge's impartiality." Goldfarb, 460 N.J. Super. at 31 (quoting Code of Jud. Conduct r. 2.1 cmt. 3). "A movant

need not show actual prejudice; 'potential bias' will suffice." Ibid. (quoting State v. Marshall, 148 N.J. 89, 276 (1997)).

However, "[j]udges may not 'err on the side of caution and recuse themselves unless there is a true basis that requires disqualification.'" Ibid. (quoting Johnson v. Johnson, 204 N.J. 529, 551 (2010) (Rabner, J., concurring)). "A judge's duty to sit where appropriate is as strong as the duty to disqualify oneself where sitting is inappropriate." Ibid.; see also Hundred E. Credit Corp. v. Eric Schuster Corp., 212 N.J. Super. 350, 358 (App. Div. 1986) ("It is not only unnecessary for a judge to withdraw from a case upon a mere suggestion that he is disqualified; it is improper for him to do so unless the alleged cause of recusal is known by him to exist or is shown to be true in fact.").

Following our reversal and remand, defendant filed a disqualification motion, arguing the judge should be recused from presiding over the remand trial because he had rendered credibility determinations following the 2017 trial. Plaintiff responded there was no showing of bias or prejudice on the part of the judge and a reversal on appeal was an insufficient ground to seek disqualification of the judge. Plaintiff also pointed out that because the case had begun over seven years prior and had involved multiple proceedings and multiple judges, it would be counterproductive to involve yet another judge.

A-2790-21

Relying on Rule 1:12-1, Rule 1:12-2, and N.J.S.A. 2A:15-49, the judge denied defendant's motion. The judge was

> satisfied in reviewing its decision [following the 2017 trial] that the [c]ourt did not in its view make credibility findings in the hearings that were conducted by th[e c]ourt. And those hearings were with regard to matters that were not considered in the summary judgment motion. But the [c]ourt actually pointed to areas in the testimony, and cited to those areas in the testimony that were insufficient for this [c]ourt to make the findings that it was called upon to make by . . . defendant. It was not based on credibility.

As to the partial summary judgment motion, the judge was "satisfied that the decisions that the [c]ourt made with regard to the summary judgment were based primarily on the documents that were presented before it, without regard to any testimony." Finally, the judge determined he

> ha[d] not formed any bias or prejudice against any of the parties in making determinations of what evidence to rely on based on testimony [p]resented before it. . . . And the [c]ourt is satisfied that there is no bias or prejudice as a result of those rulings.
>
> . . . .
>
> The [c]ourt is satisfied in this case that it can sit and be fair and impartial and decide the issues that will necessarily come before it to determine the nature of the property right that exists between the parties.

A-2790-21

The judge entered a memorializing order on August 26, 2019. Defendant subsequently moved for reconsideration, which was denied on January 17, 2020.[16]

We discern no abuse of discretion in the judge's ruling. Defendant argues the judge should have recused himself from the remand trial pursuant to Rule 1:12-1(d) because he had already given an opinion on the matter in question in the action. However, Rule 1:12-1 provides that:

> [p]aragraphs (c), (d), and (e) shall not prevent a judge from sitting because of having given an opinion in another action in which the same matter in controversy came in question or given an opinion on any question in the controversy in the pending action in the course of previous proceedings . . . .

Moreover, "[t]he mere fact that a judgment resulting from previous proceedings had been reversed on appeal is not a sufficient ground for recusal." Hundred E. Credit Corp., 212 N.J. Super. at 358. Here, the judge only provided an opinion on issues in previous proceedings in his capacity as the judge in the case.

---

[16] Although defendant lists the January 17, 2020 order denying its motion for reconsideration in its NOA, defendant does not make any argument on appeal related to the reconsideration motion and thus has waived any argument as to the reconsideration denial. See Green Knight Capital, LLC v. Calderon, 469 N.J. Super. 390, 396 (App. Div. 2021) ("An issue not briefed on appeal is deemed waived" (quoting Woodlands Cmty. Ass'n v. Mitchell, 450 N.J. Super. 310, 319 (App. Div. 2017))), aff'd as modified, 252 N.J. 265 (2022).

Defendant also argues the judge should have recused himself because he made prior credibility determinations. In support, defendant predominantly cites family law cases where appellate courts have remanded to a different trial judge because the original judge made credibility determinations. See, e.g., Johnson v. Johnson, 411 N.J. Super. 161, 175 (App. Div. 2009), rev'd on other grounds, 204 N.J. 529 (2010) (remanding to a different judge to resolve custody and parenting-time issues "out of a concern that the Family Part judge may be committed to his findings based on the arbitration award"); P.T. v. M.S., 325 N.J. Super. 193, 221 (App. Div. 1999) (remanding to a different judge where the "judge's statements went considerably beyond what was needed or necessary to resolve the issue at hand, and cast doubt upon the realistic possibility of an impartial hearing before the same judge on remand"); J.L. v. T.F., 317 N.J. Super. 418, 438 (App. Div. 1999) (directing the hearing on remand be conducted by a different judge because the motion judge improperly made credibility determinations on a summary judgment motion).

These cases are clearly distinguishable. Here, there was no evidence the judge was committed to his findings, made any statements that went beyond what was necessary to resolve the issue at hand, or made credibility findings in adjudicating a summary judgment motion. Moreover, "[t]he mere fact that a

60

judge has issued legal rulings or made factual findings in a case does not warrant reassignment in the event of reversal and remand." Brown v. Brown, 348 N.J. Super. 466, 493 (App. Div. 2002). Indeed, "in the normal course of litigation, a trial judge's findings of fact, including findings regarding the credibility of parties, and findings under R. 1:10 that a party has violated a court order, do not warrant reassignment." P.T., 325 N.J. Super. at 221. Only "where findings of credibility respecting the testimony of key witnesses have been made, and where a significant portion of those findings have been found unsupported by the record" does "fairness dictate[] a fresh look" by a different judge. Brown, 348 N.J. Super. at 493.

Here, the judge did not make credibility findings in connection with the summary judgment motion but made conclusions of law relative to interpreting the 1963 agreement. Our reversal of that finding does not necessitate the judge's recusal. Hundred E. Credit Corp., 212 N.J. Super. at 358. Further, following the 2017 trial on the remaining issues, the judge did not find defendant's witnesses incredible, but stated defendant's witnesses could not provide "evidence satisfactory to the [c]ourt to conclude that the Sixth Street lot was not being used for parking." On the other hand, the judge found Rabbi Tendler's testimony "convinced" the court that the Sixth Street lot had been used for

parking. Even if the judge made credibility findings in the 2017 trial, because those findings were supported by the record, we are satisfied there was no error in the judge's decision to deny the recusal motion. Brown, 348 N.J. Super. at 493.

Additionally, there is no credible evidence that the judge was biased to warrant recusal. See Hundred E. Credit Corp., 212 N.J. Super. at 358. Significantly, in our unpublished opinion, we did not direct the matter be heard on remand by a different trial judge. See Congregation Sons of Israel, slip op. at 13. The absence of such a direction supports the inference that we found no evidence of bias, prejudice, or impropriety by the judge to prevent him from presiding over the remand trial fairly and impartially.

Defendant argues the judge erred in denying its motion to compel the return of monies paid pursuant to the June 27, 2017 judgment, acknowledging plaintiff's easement rights, and the March 6, 2018 order, awarding plaintiff sanctions for defendant's violation of those rights. In support, defendant asserts the orders were vacated by our June 25, 2019 opinion in A-5303-16.

Our opinion in A-5303-16 only discussed the partial summary judgment order on appeal. Congregation Sons of Israel, slip op. at 13. Although we "vacate[d] all of the other orders under review," ibid., we did not discuss

defendant's arguments pertaining to those orders. Relying on our reversal, defendant moved to compel the return of monies paid pursuant to the June 27, 2017 and March 6, 2018 orders.

In denying defendant's motion, the judge found defendant "did not specifically challenge the enforcement action of the [c]ourt." The judge explained:

> No claims were made that the [c]ourt erred procedurally or substantively as to an enforcement of its orders. To accept defendant's argument that this [c]ourt should vacate all of its enforcement actions would be the equivalent of enforcing a stay of the court action that was never . . . granted.
>
> The law in New Jersey is to the contrary. It's well-established that a party's obligation to perform under a trial court order is not automatically stayed by the filing of an appeal or other proceedings in the [a]ppellate court. That's Rule 2:9-5[(a)]. . . .
>
> . . . .
>
> Here, there is no claim by defendants in their appeal that the [c]ourt erred in such fashion in those enforcement proceedings, and the Appellate Division didn't address it. It is this [c]ourt's view that the Appellate Division did not intend, therefore, to vacate the enforcement proceedings this [c]ourt entered pursuant to Rule 1:10-3 as it was not challenged specifically and does not appear to have been before the [Appellate Division]. I'll note that, generally, there are specific requirements to appeal . . . which must be taken, and it doesn't appear that they were taken, and I

A-2790-21

would also note that that final order was not vacated, that March [26, 2018] order.[17]

So, I'm going to deny defendant's application to vacate those enforcement applications.

The judge entered an order memorializing the decision on February 5, 2020.

A denial of a motion to compel is reviewed on appeal for an abuse of discretion. Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371 (2011). We also "review an order to enforce litigant's rights under Rule 1:10-3 for an abuse of discretion." Lipsky v. N.J. Ass'n of Health Plans, Inc., 474 N.J. Super. 447, 463 (App. Div. 2023). Under that standard, we "consider whether the court's order was 'made without rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Id. at 463-64 (quoting Wear v. Selective Ins. Co., 455 N.J. Super. 440, 459 (App. Div. 2018)).

"Rule 1:10-3 is a device enabling litigants to obtain enforcement of a court order." Id. at 463. "If the court determines that a litigant has disobeyed an order, the court has discretion and flexibility in fashioning an appropriate remedy to

---

[17] To the extent defendant seeks the return of $11,544.63 in attorney's fees paid to plaintiff pursuant to the March 26, 2018 order, we decline to consider the argument because that order was not included in defendant's April 18, 2018 amended NOA in A-5303-16. See 1266 Apartment Corp. v. New Horizon Deli, Inc., 368 N.J. Super. 456, 459 (App. Div. 2004) (noting an appellate court will review "only the judgment or orders designated in the notice of appeal"); Kornbleuth v. Westover, 241 N.J. Super. 289, 298-99 (2020) (same).

compel compliance." Ibid. Rule 2:9-5(a) provides, in part, that "neither an appeal, nor motion for leave to appeal, nor a proceeding for certification, nor any other proceeding in the matter shall stay proceedings in any court in a civil action or summary contempt proceeding . . . ." Under Rule 2:9-1(a), "supervision and control of the proceedings on appeal . . . shall be in the appellate court from the time the appeal is taken" except "that the trial court shall have continuing jurisdiction to enforce judgments and orders pursuant to [Rule] 1:10 . . . ."

Here, we discern no abuse of discretion in the judge's denial of defendant's motion to compel. Defendant did not obtain a stay of the June 27, 2017 or March 6, 2018 order while the appeal in A-5303-16 was pending. Thus, the appeal alone did not relieve defendant of its duty to comply. See R. 2:9-5(a). Further, the damages paid pursuant to the June 27, 2017 judgment pertained to defendant's interference with plaintiff's HVAC system. The damages from the 2017 trial were not discussed in our decision, nor did we invalidate that judgment as erroneous. Thus, even if the judge had compelled plaintiff to return the monies paid by defendant, the judge would have required defendant to pay plaintiff the same damages amount as the judge ultimately found plaintiff was

granted an easement to park on defendant's property and use its property for their HVAC system.

The same is true of the March 6, 2018 order. Our decision did not invalidate the March 6, 2018 order as erroneous or address defendant's violation of the June 27, 2017 judgment that led to the sanctions imposed in the March 6, 2018 order. Again, even if the judge had compelled plaintiff to return the monies, the sanctions would have been reinstated as defendant's violation was undeniable. Thus, we are satisfied that any error was harmless. See Lanzo v. Cyprus Amax Mins. Co., 467 N.J. Super. 476, 508 (App. Div. 2021) ("Any error deemed harmless should be disregarded").

Defendant argues the judge abused his discretion by entering two February 21, 2019 orders that sanctioned defendant for intentionally violating the June 27, 2017 judgment, and two May 29, 2019 orders that granted plaintiff attorney's fees.

After the June 27, 2017 judgment was entered, plaintiff filed two separate enforcement actions—one on June 4 and one on October 19, 2018. On June 4, 2018, plaintiff sought an OTSC to enforce litigant's rights alleging defendant had continued to violate the June 27, 2017 judgment by continuously allowing students to walk between the parked cars in the Sixth Street lot during religious

services and other functions. In support, Rabbi Tendler certified "[e]very school day from February 15, 2018[,] through the present, I have personally observed parents dropping their children off on Sixth Street and children ingress the school between parked cars during religious services." He attached several photographs of cars parked blocking plaintiff's entrance to the Sixth Street lot or of children walking between the cars parked in the Sixth Street lot. Tendler also testified during a preliminary hearing held on October 17, 2018, and reiterated that students were still going in and out through the parked cars in the Sixth Street lot during services. He also observed buses dropping the students off in the Sixth Street lot.

In a December 4, 2018 hearing, defendant produced several witnesses, including Gershon Dinkels, a bus driver at defendant's school. Dinkels was aware of the court order not to drop students off in the Sixth Street lot and testified the only time a bus dropped students off in the Sixth Street lot was when there was a substitute driver.[18] Mordechai Bursztyn, an assistant at defendant's school, also testified for defendant. According to Bursztyn, after the court order

---

[18] According to Dinkels, there were approximately 200 students attending the school by bus.

was issued, he personally told the students' parents to discontinue dropping the children off on Sixth Street and to use Fifth Street instead.

After defendant obtained a permit to build a fence on its property to prevent plaintiff from parking there following the ZBA's ruling that plaintiff's parking was an illegal, non-conforming use, plaintiff sought another OTSC on October 19, 2018, seeking emergent restraints to have the fence removed as a violation of the June 27, 2017 judgment. The judge held a preliminary hearing on the OTSC related to the fence the same day, found defendant was in violation of the June 27, 2017 judgment, and granted plaintiff's application for injunctive relief. As a result, the judge ordered defendant to remove the fence and to reimburse plaintiff for the cost of removal, and enjoined defendant from "any further interference with the easement."

The judge explained:

> The [c]ourt recognizes for what this is, another attempt to stretch the scope of the [c]ourt's ruling and test the [c]ourt's rulings in this matter. The [c]ourt has issued its rulings, these rulings may be disagreed with by the parties. Ultimately, the Appellate Division will determine . . . whether the [June 27, 2017] order should be vacated or not. But while it's in effect it should be followed.

In a final hearing on the OTSC held on December 4, 2018, the judge "made the restraint permanent with regard to the fence" and granted plaintiff attorney's fees

upon the submission of an appropriate application based on defendant's "intentional violation" of the easement rights.

On February 21, 2019, the judge granted plaintiff's June 4, 2018 application for an OTSC and awarded plaintiff $2,500 in sanctions. In his statement of reasons, the judge explained:

> From the testimony taken during this enforcement proceeding, this [c]ourt is clearly convinced that children are still ingressing and egressing through the [Sixth Street] lot during service hours and that this violation has continued on a regular basis over a long period of time. These violations primarily consisted of students being dropped off by parents who either drove into the [S]ixth [S]treet lot to drop their children off, or dropped them off at the curb, whereupon the children crossed through the cars to the front entrance of the school. This activity is continuing to create a dangerous situation and interfering with . . . plaintiff's easement rights. Further, this [c]ourt is satisfied that . . . defendant has not taken sufficient action to stop the activity, even after prior enforcement proceedings, and as such is intentionally violating the [c]ourt's order.

The judge added that because "this is the second violation based on the same activity," "[t]he intent is to end this dangerous activity now by coercing defendant into taking the necessary steps to end this dangerous behavior that clearly interferes with plaintiff's use of its parking easement." The judge further found that "plaintiff should also be permitted attorney's fees" and directed

plaintiff to submit an affidavit of services to calculate the appropriate counsel fee award.

On the same date, February 21, 2019, the judge also entered an order finding the construction of the fence a violation of the June 27, 2017 judgment and directing defendant to "reimburse [p]laintiff $550[] for the cost and expense incurred to remove the fence." The order also indicated that "an award for reasonable counsel fees shall be granted in favor of [p]laintiff . . . for fees incurred as the result of [d]efendant's violation of the June 27, 2017 [o]rder of [j]udgment, specifically related to [d]efendant's installation of a fence across the Sixth Street [l]ot," and directed plaintiff to submit an affidavit of services to calculate the appropriate award.

In two separate orders dated May 29, 2019, the judge awarded plaintiff attorney's fees in connection with the June 4 and October 19, 2018 OTSCs. Regarding the June 4, 2018 OTSC, plaintiff submitted an affidavit of services totaling $32,966.96, including costs. The affidavit described each attorney's hourly rate and the tasks each performed to prepare and file the application. The judge awarded the full amount requested. Plaintiff also filed an affidavit of services in connection with the October 19, 2018 OTSC, totaling $11,257.50, including costs. The affidavit detailed each attorney's hourly rate and the tasks

each performed to prepare and file the application. The judge awarded the full amount requested.

"[A] reviewing court will disturb a trial court's award of counsel fees 'only on the rarest of occasions, and then only because of a clear abuse of discretion.'" Litton Indus., Inc. v. IMO Indus., Inc., 200 N.J. 372, 386 (2009) (quoting Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 444 (2001)). Similarly, we "review an order to enforce litigant's rights under Rule 1:10-3 for an abuse of discretion." Lipsky, 474 N.J. Super. at 463. "However, '[t]he scope of relief in a motion in aid of litigants' rights is limited to remediation of the violation of a court order.'" Ibid. (quoting Abbott v. Burke, 206 N.J. 332, 371 (2011)).

Rule 1:10-3 provides that "[t]he court in its discretion may make an allowance for counsel fees to be paid by any party to the action to a party accorded relief under this rule." "[T]his rule provision allowing for attorney's fees recognizes that as a matter of fundamental fairness, a party who willfully fails to comply with an order or judgment entitling his adversary to litigant's rights is properly chargeable with his adversary's enforcement expenses." Pressler & Verniero, Current N.J. Court Rules, cmt. 4.4.5 on R. 1:10-3 (2026).

Here, we discern no abuse of discretion on the part of the judge in entering the February 21 and May 29, 2019 orders. The June 27, 2017 judgment was still

in effect when these enforcement orders were entered. The judge's findings that defendant was intentionally violating the June 27, 2017 judgment were amply supported by the motion record. Based on those findings, the judge had the discretion to "fashion[] an appropriate remedy to compel compliance." Lipsky, 474 N.J. Super. at 463.

Likewise, we discern no abuse of discretion in the judge's award of counsel fees as to both the June 4 and October 19, 2018 OTSCs. Plaintiff submitted an affidavit of services for both orders that detailed its attorneys' hourly rates and work completed. There is nothing to demonstrate the rates were unreasonable or the tasks unnecessary. Significantly, defendant offers no argument on appeal to discredit or undermine the reasonableness of the awards. Every appellant has the burden "of showing error in the judgment under review." Bowen v. Olesky, 37 N.J. Super. 19, 25 (App. Div. 1955), aff'd, 20 N.J. 520 (1956). Here, defendant has failed to carry its burden.

III.

Prerogative Writs Appeal:

Resolution No. 4010A at issue in A-1339-22 states that "[t]he [z]oning [o]rdinances of the Township of Lakewood were adopted in the 1930s" and that plaintiff's synagogue was built "in the 1960s" in the "R-OP Zone." The

72

resolution further notes "[t]he Township, after a rigorous and full search, could not find any [r]esolutions, [p]lans, [p]ermits or any other documentation related to the constructing of the structures on property owned by [plaintiff]." The resolution provides defendant, as the owner of the property, is "legally entitled" to request a "non-conforming use/structure determination" pursuant to N.J.S.A. 40:55D-68, and the ZBA "has jurisdiction to make such determination" and is not "precluded by the [ZBA's] earlier determination of having no . . . authority to interpret the 1972 School Site Plan/Resolution."

The resolution continued:

> The [ZBA] is aware of the [c]ourt determination that the 1963 Agreement provided for and established a private easement for [plaintiff's] staff/attendees to park vehicles . . . . However, that an owner of property may extend an easement or permission to another property owner to use a portion of its property for some use or structure does not override or negate the need for conformance to zoning or those owners obtaining zoning approval for the supposed easement use. A property owner needs such zoning approval to use its own property, particularly if the use/structure is non-conforming. Whatever the private [a]greements between the parties, the parking lot use on the Sixth Street courtyard as an off-site parking area . . . has been non-conforming and there is no evidence presented that such non-conforming use/structure ever was validly established as per zoning requirements.

73

Thus, the ZBA determined "parking in general" on the Sixth Street lot "is not a valid or legal non-conforming use" and "should not occur or continue unless and until there is a proper zoning application for the necessary site plan and variance approvals to any appropriate [b]oard, and approvals are properly granted."

Plaintiff challenged Resolution No. 4010A in its prerogative writs action, arguing at the hearing the ZBA "departed from [its] previous position in 2016" where it "resisted the urge to go beyond [its] jurisdiction and issue an interpretation" of the 1972 site plan. Plaintiff also argued "the primary basis for the [ZBA] determining that it was a non-conforming use . . . [was] because no site plan could ever be produced," but "Lakewood didn't appear to adopt a requirement for site plan until 1971."

Plaintiff asserted the ZBA's decision was arbitrary and capricious because there was "no evidentiary support that the use of the parking easement on Sixth Street and Fifth Street [was] not a permitted or conforming use," nor "was there any evidence submitted that a site plan was required in 1963 when [plaintiff] began using the lot for parking." Plaintiff added "[t]he record before the [ZBA] relied heavily on personal beliefs of several . . . members that there was never any parking on [the Sixth Street lot] since 1963 which has now been debunked by the [remand] trial." Defendant countered plaintiff's use of the Sixth Street

74

lot for parking was a nonconforming use and the burden of proof was on plaintiff, as "the proponent" of the non-conforming use, not "the objector."

Dasti, the ZBA's counsel, confirmed at the hearing the ZBA could "find no site plan ordinance in Lakewood Township until about 1971" and "[n]o one can find a building permit for [the Sixth Street] parking lot" though "everyone agrees this parking lot was constructed with the then approval of the prior owner." Further, Dasti stated the properties are "in the ROP zone" and "[p]arking lots are not permitted" "[a]s a primarily permitted use." Dasti also confirmed that under N.J.S.A. 40:55D-68, "the applicant has the burden of proof" and "[t]he applicant was [defendant], not [plaintiff]."

Following the hearing, the judge issued an order and opinion on December 1, 2022, finding the ZBA's decision memorialized in Resolution No. 4010A was "arbitrary, capricious and unreasonable; clearly not supported by facts or law, and beyond the jurisdiction of the ZBA." The judge also found "any enforcement efforts by Lakewood based upon the Board's determinations [were] invalid and the Notice of Violation must be dismissed."

On appeal, defendant argues the judge erred in finding the ZBA lacked jurisdiction to hear its application. In its application, defendant requested "an interpretation as per N.J.S.A. 40:55D-70(a) and (b) and/or an application for a

75

determination/certificate as per N.J.S.A. 40:55D-68 as to whether the use of [the Sixth Street lot] for parking of vehicles . . . is a valid non-conforming use." At the hearing, defendant told the ZBA it was focusing its application on N.J.S.A. 40:55D-68, despite Dasti's repeated advice that the ZBA did not have jurisdiction to hear defendant's application because defendant did not meet the requirements of N.J.S.A. 40:55D-68.

In her written opinion, the judge found defendant's application to the ZBA "was again tainted by the Board's lack of jurisdiction to render this opinion," explaining:

> The Board's attorney advised that the right to render this opinion was not available under N.J.S.A. 40:55D-68. Certification of a valid nonconforming use protects a property owner from changes in the zoning ordinance which renders a particular use or bulk dimension no longer valid. To invoke this process, the applicant must show that the use was valid when it commenced and therefore it should receive protected status to continue notwithstanding the changes in the zoning code or ordinances. [Defendant] in this case, dissatisfied with the rulings of the Superior Court, sought a creative avenue to achieve what it could not in the Superior Court. Creative, however, does not mean that is correct. There is no showing before the ZBA that a change in the zoning code rendered the act of parking vehicles pursuant to a long-standing easement had been adversely affected. Instead, [defendant] sought and apparently obtained from the ZBA an opinion that the synagogue had never been approved by site plan, that the parking had not been continuous, and that the

easement was ineffective.  The ZBA had no authority to make such a determination, especially since [the remand judge] had made a ruling on the easement that was binding upon the parties.

"When reviewing a trial court's decision regarding the validity of a local board's determination, 'we are bound by the same standards as was the trial court.'" Jacoby v. Zoning Bd. of Adj. of Englewood Cliffs, 442 N.J. Super. 450, 462 (App. Div. 2015) (quoting Fallone Props., LLC v. Bethlehem Twp. Plan. Bd., 369 N.J. Super. 552, 562 (App. Div. 2004)).  "[Z]oning boards, because of their peculiar knowledge of local conditions[,] must be allowed wide latitude in the exercise of delegated discretion."  Dunbar Homes, Inc. v. Zoning Bd. of Adj. of Franklin, 233 N.J. 546, 558 (2018) (alterations in original) (quoting Price v. Himeji, LLC, 214 N.J. 263, 284 (2013)).  "A zoning board's land use decisions thus 'enjoy a presumption of validity.'"  Ibid. (quoting Price, 214 N.J. at 284).

As such, "the action of a board will not be overturned unless it is found to be arbitrary and capricious or unreasonable, with the burden of proof on the [party] challenging the action."  Ibid. (quoting Grabowsky v. Twp. of Montclair, 221 N.J. 536, 551 (2015)).   "A board acts arbitrarily, capriciously, or unreasonably if its findings of fact in support of a grant or denial of [an application] are not supported by the record, or if it usurps power reserved to

the municipal governing body or another duly authorized municipal official." Ten Stary Dom P'ship v. Mauro, 216 N.J. 16, 33 (2013).

"On the other hand, however, a board's decision regarding a question of law . . . is subject to a de novo review by the courts, and is entitled to no deference since a zoning board has 'no peculiar skill superior to the courts' regarding purely legal matters." Dunbar Homes, Inc., 233 N.J at 559 (alteration in original) (quoting Chicalese v. Monroe Twp. Plan. Bd., 334 N.J. Super. 413, 419 (Law Div. 2000)); see also 388 Route 22 Readington Realty Holdings, LLC v. Twp. of Readington, 221 N.J. 318, 338 (2015) ("In construing the meaning of a statute, an ordinance, or our case law, our review is de novo."). The same is true for appellate courts when reviewing a trial court's decision where "review of the judge's interpretations of law and applications of law to facts is de novo." Mountain Hill, L.L.C. v. Twp. Comm. of Middletown, 403 N.J. Super. 146, 193 (App. Div. 2008).

Determining whether defendant's application was properly before the ZBA pursuant to N.J.S.A. 40:55D-68 or -70, and thus whether the ZBA had the ability to even hear the application, poses a question of law. Our Supreme Court has stressed that "[l]egislative intent is the paramount goal when interpreting a statute and, generally, the best indicator of that intent is the statutory language."

A-2790-21

Dunbar Homes, Inc., 233 N.J. at 559 (quoting State v. Marquez, 202 N.J. 485, 499 (2010)). Reviewing courts must not "rewrite a plainly-written enactment of the [l]egislature []or presume that the [l]egislature intended something other than that expressed by way of the plain language." DiProspero v. Penn, 183 N.J. 477, 492 (2005) (alterations in original) (quoting O'Connell v. State, 171 N.J. 484, 488 (2002)). "Our duty is to construe and apply the statute as enacted." Ibid. (quoting In re Closing of Jamesburg High Sch., 83 N.J. 540, 548 (1980)).

"A zoning board of adjustment 'may exercise only those powers granted by statute.'" Cerebral Palsy Ctr., Bergen Cnty., Inc. v. Mayor of Fair Lawn, 374 N.J. Super. 437, 444 (App. Div. 2005) (quoting Paruszewski, 154 N.J. at 54). Pursuant to N.J.S.A. 40:55D-70 of the MLUL, the zoning board of adjustment "shall have the power to":

> a. Hear and decide appeals where it is alleged by the appellant that there is error in any order, requirement, decision or refusal made by an administrative officer based on or made in the enforcement of a zoning ordinance;
>
> b. Hear and decide requests for interpretation of the zoning map or ordinance or for decisions upon other special questions upon which such board is authorized to pass by any zoning or official map ordinance, in accordance with this act . . . .
>
> [N.J.S.A. 40:55D-70.]

The board of adjustment also has authority to act in connection with an application brought pursuant to N.J.S.A. 40:55D-68, which provides, in relevant part:

> Any nonconforming use or structure existing at the time of the passage of an ordinance may be continued upon the lot or in the structure so occupied and any such structure may be restored or repaired in the event of partial destruction thereof.
>
> The prospective purchaser, prospective mortgagee, or any other person interested in any land upon which a nonconforming use or structure exists may apply in writing for the issuance of a certificate certifying that the use or structure existed before the adoption of the ordinance which rendered the use or structure nonconforming. The applicant shall have the burden of proof.
>
> [N.J.S.A. 40:55D-68.]

The MLUL defines "[n]onconforming use" as "a use or activity which was lawful prior to the adoption, revision or amendment of a zoning ordinance, but which fails to conform to the requirements of the zoning district in which it is located by reasons of such adoption, revision or amendment." N.J.S.A. 40:55D-5. N.J.S.A. 40:55D-68 has been "consistently construed as allowing a property owner to indefinitely continue a nonconforming use." S&S Auto Sales, Inc. v. Zoning Bd. of Adj. for Borough of Stratford, 373 N.J. Super. 603, 622 (App. Div. 2004).

Relying on either N.J.S.A. 40:55D-70 or N.J.S.A. 40:55D-68, defendant stated that its "application is asking that the [ZBA] find that there's legally not a parking lot there [on the Sixth Street lot], it cannot remain there" despite the remand judge's prior rulings to the contrary. N.J.S.A. 40:55D-70(a) does not apply because defendant is not "alleg[ing] . . . that there is error in any order, requirement, decision or refusal made by an administrative officer based on or made in the enforcement of the zoning ordinance." Similarly, N.J.S.A. 40:55D-70(b) does not apply because defendant was not seeking an "interpretation of the zoning map or ordinance" by the ZBA.

Defendant admitted at the hearing it was focusing its application on N.J.S.A. 40:55D-68, as reflected in Resolution No. 4010A. However, N.J.S.A. 40:55D-68 is likewise inapplicable. Defendant's application sought a certificate that plaintiff's use of the Sixth Street lot for parking was not a valid conforming use. N.J.S.A. 40:55D-68 allows a "person interested in any land upon which a nonconforming use or structure exists" to receive the "issuance of a certificate certifying that the use or structure existed before the adoption of the ordinance which rendered the use or structure nonconforming." Here, as defendant acknowledged, the Township zoning ordinances were adopted in the 1930's, decades before the properties in question were built. Thus, plaintiff's use of the

Sixth Street lot did not "exist before the adoption" of any ordinance "which rendered the use or structure nonconforming." N.J.S.A. 40:55D-68.

Critically, defendant never claimed plaintiff's parking on the Sixth Street lot was at one time conforming and became nonconforming by a later ordinance, which is the crux of N.J.S.A. 40:55D-68. Instead, defendant posited plaintiff's use of the Sixth Street lot for parking was never conforming. Thus, defendant invoked N.J.S.A. 40:55D-68 for an improper purpose, particularly when the remand judge had already ruled to the contrary. As the ZBA's counsel stated, enforcement determinations should be made by the Township or the courts. See N.J.S.A. 40:55D-18 (noting the "governing body of a municipality shall enforce" the MLUL and "any ordinance or regulation made and adopted hereunder").

Because neither N.J.S.A. 40:55D-70 nor -68 was applicable, we agree with the judge the ZBA lacked the authority to hear defendant's application and exceeded its statutory powers in doing so. Cerebral Palsy Ctr., Bergen Cnty., Inc., 374 N.J. Super. at 444 ("A zoning board of adjustment 'may exercise only those powers granted by statute.'" (quoting Paruszewski, 154 N.J. at 54)). Therefore, we affirm the judge's determination that the ZBA lacked jurisdiction

to hear defendant's application. Based on our decision, we need not address defendant's remaining arguments.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division